UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| ERIC CAINE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| JON BURGE, JAMES PIENTA, RAYMOND | ) | |
| MADIGAN, WILLIAM MARLEY, WILLIAM | ) | |
| PEDERSON,DANIEL MCWEENY, CITY OF | ) | |
| CHICAGO and UNIDENTIFIED EMPLOYEES | ) | |
| OF THE CITY OF CHICAGO, | ) | JURY TRIAL DEMANDED |
| | ) | |
| Defendants. | ) | |

## COMPLAINT

NOW COMES Plaintiff, ERIC CAINE, by his attorneys, LOEVY &
LOEVY, and complaining of Defendants, JON BURGE, JAMES PIENTA,
RAYMOND MADIGAN, WILLIAM MARLEY, WILLIAM PEDERSON, DANIEL
MCWEENY, and UNIDENTIFIED EMPLOYEES of the CITY OF CHICAGO,
acting pursuant to the City's policies and practices
(collectively, "Defendant Officers"), and the City of Chicago,
alleges as follows:

### INTRODUCTION

1. In the 1980s, Eric Caine was convicted of a
brutal double homicide that he did not commit. The only
evidence introduced against Mr. Caine at trial was his coerced
false confession and the coerced false confession of his co-

defendant, Aaron Patterson. Both of these wrongful confessions were procured with violence inflicted by members of the City's now notorious Area Two detective headquarters, headed by Jon Burge.

2. Mr. Caine served twenty-five years of wrongful imprisonment before he was ultimately exonerated.

3. Unfortunately, the misconduct that caused Mr. Caine's wrongful conviction was not an isolated incident. To the contrary, Mr. Caine and his co-defendant were victimized by the same group of Area Two Police Detectives, led by Defendant Burge, who engaged in a disturbing succession of similar abuses over a period of years, frequently preying on young African-American men in order to close unsolved cases via vicious and unlawful methods of interrogation.

4. Although Mr. Caine has won back his freedom, he will never regain the decades lost in his life. This lawsuit seeks redress for those injuries.

## Jurisdiction and Venue

5. This action is brought pursuant to 42 U.S.C. Section 1983 to redress the deprivation under color of law of Plaintiff's rights as secured by the United States Constitution.

6. This court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1367. Venue is proper under 28. U.S.C. § 1391(b). A number of the parties reside in this judicial

district, and the events giving rise to the claims asserted
herein occurred here as well.

### The Parties

7.    Plaintiff Eric Caine is a 46 year-old resident
of Chicago, Illinois.

8.    Defendant City of Chicago is an Illinois
municipal corporation, and is and/or was the employer of each of
the Defendant Officers.  The City of Chicago is responsible for
the acts of the Defendant Officers while employed by the City of
Chicago and while acting within the scope of their employment.

9.    At all times relevant hereto, Defendants Jon
Burge, James Pienta, Raymond Madigan, William Marley, William
Pederson, and Daniel McWeeny were police officers in the Chicago
Police Department acting under color of law and within the scope
of their employment for the City of Chicago.

### The Sanchez Murders

10.   On April 19, 1986, an elderly Hispanic couple,
Rafaela and Vincent Sanchez, were discovered dead in their
apartment at 8849 South Burley Avenue in Chicago, Illinois.
Among the officers present at the crime scene was Lieutenant Jon
Burge.

11.   A few days later, on April 22, 1986, Area Two
detectives arrested Michael Arbuckle in connection with the
murders, although Mr. Arbuckle had nothing to do with the

3

killings.  Defendant Jon Burge and Gang Crimes Officer Kolowitz accompanied Arbuckle to Area Two Headquarters.

12.  While at Area Two, Arbuckle was placed in an office and questioned about the Sanchez murders by Burge and Kolowitz.  Officers Burge and Kolowitz informed Arbuckle that they "really wanted to get Aaron Patterson," or words to that effect.

13.  The officers tried to convince Arbuckle to inculpate Patterson in the double homicide.  When Arbuckle refused to implicate Patterson, Defendant Burge threatened him with the death penalty.  Burge then promised Arbuckle that he would get him to "cooperate one way or another."

14.  Defendant Burge questioned Arbuckle again the next morning.  The interrogation focused solely on the Sanchez murders.  Burge threatened Arbuckle, and told him that Burge would "get some drug dealers to testify against [him] on the Sanchez murder if [he] did not cooperate," or words to that effect.

15.  Despite Burge's threats, Arbuckle continued to tell the truth: he denied any involvement in the murders and refused to implicate Patterson.

16.  In the afternoon of April 30, 1986, Aaron Patterson was arrested in connection with the Sanchez murders, although Patterson had nothing to do with the killings.

Patterson was transported to Area Two Headquarters by Defendants Pienta, Marley, and Pederson.

**Under Duress, Patterson Falsely Implicates Mr. Caine**

17.   Around 6:00 p.m. that day, Patterson was placed in an interrogation room at Area Two Headquarters.  Patterson was handcuffed to the wall and questioned by various Area Two detectives, including Defendants Pienta, Marley, Pederson and other Defendant Officers, concerning the Sanchez homicides. Patterson continuously denied having any involvement in the crime.

18.   Later that evening Defendant Pienta told Patterson that he was "tired of this bullshit," or words to that effect.  Patterson continued denying any involvement in the crime.  Defendant Pienta then left the room and returned with a gray plastic typewriter cover.

19.   Patterson, at the time, had his hands cuffed behind his back.  Defendant Pienta, Marley, and Pederson together with other Defendant Officers, then turned off the lights, placed the plastic cover over his head, and struck Patterson repeatedly in the chest.  The cover was held against his mouth and nose, constricting his breathing.  The cover remained on for over a minute.  Patterson was being suffocated to death.

20. When Patterson still did not confess, he was beaten and suffocated a second time by the same individuals. Afraid that he would be suffocated to death, Patterson acquiesced and told his torturers that he would say "anything you say" in order to make the torture stop.

### Patterson's Contemporaneous Outcry of Torture

21. While alone in his interrogation room, Mr. Patterson scratched into the bench that he was tortured and that his statement to the police was false. Specifically, Mr. Patterson etched the following message into the bench: "Aaron 4/30 I lie about murders [,] Police threaten me with violence [,] Slapped and suffocated me with plastic [,] No lawyer or dad [,] No phone."

22. After Patterson scratched the message into the bench, Assistant State's Attorney Kip Owen and Defendant Jon Burge came to speak with Patterson. Patterson asked Owen to force Burge to leave. Burge subsequently left the room. Patterson then informed Owen that he wanted a lawyer and had nothing to say. Owen immediately opened the door, revealing Defendant Burge standing directly on the other side. Owen told Burge that Patterson refused to give a statement.

23. Owen then left the room and Defendant Burge entered, screaming "You're fucking up!" Burge pulled out his revolver and placed it on top of the table. Burge then informed

6

Patterson that "if you don't do what we tell you to, you're going to get something worse than before...it will have been a snap compared to what you will get."  Burge then asked Patterson if he was going to cooperate.  Burge informed Patterson that "it's your word against ours and who are they going to believe, you or us?"  Defendant Burge continued to threaten Patterson, telling him that Burge could do anything he wanted to do to Patterson.

24.  Later, Assistant State's Attorney Peter Troy, entered the interrogation room with Defendant Madigan. Patterson told them that he would confess if he could call his family and an attorney.  Troy and Defendant Madigan agreed. After the calls, Patterson refused to make a statement, or to sign a statement written by Troy.

25.  Defendant Madigan, accompanied by Assistant State's Attorney Troy, then beat Mr. Patterson once again, trying to get Patterson to falsely confess.

26.  Defendant McWeeny then entered the room and professed to be a good cop, one of the few who did not torture suspects at Area Two Headquarters.  Defendant McWeeny urged Patterson to cooperate because the other detectives "could do something serious to him if he didn't."

27.  After Defendant McWeeny left the room, Aaron Patterson scratched another message into the bench.  The message read: "Signed false statement to murders[,] Tonto on statement is the code word[,] Aaron."

28.  A third messaged was scratched into the door frame of the interrogation room.  The message said, "Aaron lied."  All of Patterson's etchings were documented in a memo by Defendant Pienta to Defendant Burge.

29.  On May 1, 1986, at 2:45 p.m., Mr. Patterson finally broke down in the face of continuing torture, and made a false and unsigned oral statement regarding his involvement in the Sanchez murders.  He also falsely claimed that Mr. Caine was present at the murder scene.

30.  An investigator from the Cook County Public Defender's Office later documented Patterson's etchings by photographing them.

**Caine's Arrest**

31.  Defendants arrested Mr. Caine based solely on Patterson's false and coerced statement.  No other evidence pointed toward Mr. Caine's involvement in the Sanchez murders in any way whatsoever.

32.  On the same night Mr. Patterson was tortured, after he brought up Mr. Caine's name under duress, Defendants Pienta, Pederson and Area Two Sergeant Wilson arrested Mr. Caine

at his mother's home. While there, Mr. Caine was pushed in the back while he was handcuffed and walking down the stairs, causing Mr. Caine to lose his balance until one of the officers grabbed him.

33. During the ride to the police station, Mr. Caine repeatedly denied any involvement in the crimes. Nevertheless, Defendant Pienta insisted that they would have killed Mr. Caine during his arrest, but for Mr. Caine's mother's friendship with Sgt. Wilson.

34. When brought to Area Two Headquarters, Mr. Caine was interrogated by Defendants Pienta and Marley, both of whom had tortured Aaron Patterson earlier that evening.

35. Defendant Pienta told Mr. Caine that Patterson had confessed to the murders. Mr. Caine insisted, truthfully, that he knew nothing about the killings.

36. Around 11:45 p.m., Defendant Pienta brought Mr. Caine into Aaron Patterson's interrogation room. When Mr. Caine saw Patterson, he looked like he had been beaten. Mr. Caine was only in that room for a short period of time. The only purpose for bringing him there was to intimidate Mr. Caine.

37. When the Defendants returned Mr. Caine to his interrogation room, Defendant Pienta struck Mr. Caine in the chest and told him that he would get the same treatment as Patterson unless he was "cool."

9

38.  Mr. Caine spent the night locked in an interrogation room at Area Two Headquarters.

39.  While interrogating Mr. Caine the next day, Defendant Madigan began outlining the murders.  For a long period of time, while Mr. Caine remained silent, Defendant Madigan repeated key points of the confession that he wanted Mr. Caine to recite.

40.  Shortly thereafter, Defendant Madigan presented his notes for Mr. Caine to study, and subsequently sign as his own statement.  When Caine refused to sign the fabricated confession, Madigan struck Mr. Caine with a cupped hand on the side of his head.  Mr. Caine heard a loud pop and felt a rush of pain.  Mr. Caine cried out and doubled over in agony, as Defendant Madigan tried to quiet him.  The strike to Mr. Caine's head ruptured his eardrum, an extremely painful injury.

41.  Tired, fearful, and in pain from his ruptured eardrum, Mr. Caine signed the notes because he feared additional violence and wanted to go home.

42.  Later that day, Mr. Caine was brought into a room with Assistant State's Attorneys Peter Troy and William Lacey. Detective Madigan was also in the room, watching over Mr. Caine.

43.  At 5:15 a.m. the next morning, in excruciating pain after being struck in the head and held all night, Mr. Caine signed his false confession.

### Eric Caine's Trial

44.  No evidence other than Mr. Caine's and Mr. Patterson's false and coerced confessions was ever introduced at Mr. Caine's trial.  In fact, the physical evidence collected by Defendant Officers exculpated Mr. Caine and Patterson. Specifically, police found fingerprints at the crime scene that did not match Mr. Caine, Patterson, or any of the victims.

45.  Mr. Caine testified at his trial and continued to maintain his innocence.  Mr. Caine also testified about the physical abuse he suffered at the hands of Detectives Madigan and Pienta while being interrogated.  Nevertheless, on the basis of the coerced false confessions, the jury convicted Mr. Caine of murder, home invasion and residential burglary.

46.  Mr. Caine was then sentenced to life imprisonment.

### Evidence of Police Misconduct

47.  Unfortunately, Mr. Caine's jury did not hear testimony from Mack Ray, a key witness, at trial.  Mack Ray has since testified that Wayne Washington confessed to him that he and his brother Willie Washington had actually committed the Sanchez murders.

48.   Unknown to Mr. Caine, following the coerced confessions, Mack Ray went to the police station at 103rd Street and tried to tell several detectives that Wayne had confessed to the Sanchez murders, but the detectives threatened him and said he would "end up dead" if he did not stay quiet.  In fear that something would happen to him if he interfered, Mack Ray left town.

49.   Willie Washington lived next door to the Sanchezes.  Because he was not arrested for the Sanchez murders, Willie Washington had the opportunity to break into another neighbor's house and initiate another violent attack shortly after being paroled for yet another home invasion.

50.   Willie Washington has since been convicted of several other incidents of felony residential burglary and home invasion.  Washington is currently serving a 30-year sentence for home invasion in which he broke into the home of his neighbor, Colleen Hamling, and stabbed her nine times in the neck, seven times in the upper spine, eight times in the chest, and once in the hand. This crime was shockingly similar to the Sanchez murders. Willie Washington lived next door to them as well, and both were stabbed to death.

51.  Mr. Caine's jury never heard this exculpatory evidence from Mack Ray because the Defendant Officers withheld it from Mr. Caine, his defense team, and the Cook County State's Attorney's office.

### Exonerations

52.  In 2003, Patterson was pardoned from death row by then-Governor Ryan, based on Patterson's innocence.

53.  On March 16, 2011, Eric Caine's conviction was vacated.  The State immediately dismissed the charges and Mr. Caine was subsequently released after spending twenty-five years in prison for a crime that he did not commit.

### Supervisory Liability

54.  The foregoing pattern of misconduct, including the abuses of Mr. Caine in the Sanchez investigation, took place under the direct supervision of the Area Two Commander, Jon Burge.  The constitutional violations alleged herein occurred at Defendant Burge's direction, and Defendant Burge was deliberately indifferent thereto.

55.  Absent knowing participation by the command personnel responsible for supervising the Defendant Officers, the misconduct alleged in this Complaint could not have occurred.

### Chicago's "Street Files" Practice

56.  The unconstitutional withholding of exculpatory information from Mr. Caine's defense in this case, as well as the subsequent destruction of portions of the same, was all undertaken pursuant to, and proximately caused by, a policy and practice on the part of the Chicago Police Department.

57.  Specifically, at all times relevant hereto, members of the Chicago Police Department, including the Defendants in this action, systematically suppressed <u>Brady</u> material by intentionally secreting discoverable information in so-called "street files."  As a matter of widespread custom and practice, these clandestine street files were routinely withheld from the State's Attorney's Office and from criminal defendants, and were subsequently destroyed.

58.  Consistent with the municipal policy and practice described in the preceding paragraphs, Defendants in this case concealed exculpatory evidence within street files that were never disclosed to Mr. Caine's criminal defense team and that have since been destroyed.  This withholding and destruction of evidence that would have exonerated Mr. Caine was undertaken pursuant to the City's policy and practice in the manner described above.

59.  The street files practice described in the foregoing paragraphs was consciously approved at the highest

14

policy-making level for decisions involving the police department, and was a proximate cause of the injuries suffered here by the Plaintiff.

60. The street files practice described in the foregoing paragraphs was enjoined by court order and supposedly discontinued prior to the investigation of the Sanchez murders. Contrary to the Department's public pronouncements, however, the street files practice continued through and including the

Sanchez investigation, directly causing a violation of Mr. Caine's rights.

61. All of the individual Defendants acted under color of law and in the scope of their employment in engaging in the actions alleged in this Complaint.

### Count I
### Due Process

62. Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

63. As described more fully above, all of the Defendants, while acting individually, jointly, and in conspiracy, as well as under color of law and within the scope of their employment, deprived Plaintiff of his constitutional right to a fair trial.

64. In the manner described more fully above, the Defendants deliberately withheld exculpatory evidence, and fabricated false reports and other evidence, thereby misleading and misdirecting the criminal prosecution of Plaintiff. Absent this misconduct, the prosecution of Plaintiff could not and would not have been pursued.

65. The Defendant Officers' misconduct also directly resulted in the unjust criminal conviction of Plaintiff, thereby denying him his constitutional right to a fair trial, and a fair

appeal thereof, in violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

66. As a result of this violation of his constitutional right to a fair trial, Plaintiff suffered injuries, including, but not limited to, emotional distress, as is more fully alleged above.

67. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally with willful indifference to Plaintiff's constitutional rights.

68. The misconduct described in this Count was undertaken pursuant to the policy and practice of the Chicago Police Department in that Mr. Caine was the victim of, and his injuries were proximately caused by, a policy and practice on

the part of the City of Chicago to pursue and secure false convictions through profoundly flawed investigations.

69. Specifically, throughout the 1980s, a group of Chicago Police Officers in Area Two, including some or all of the Defendant Officers herein, engaged in a systematic pattern of coercion, fabrication of evidence, withholding of exculpatory information, and other illegal tactics, the sum total of which completely corrupted the investigative process.

70. This institutional desire to close cases through abusive tactics regardless of actual guilt or innocence, in order to enhance police officers' personal standing in the Department, was known to the command personnel, who themselves participated in the practice.

71. The above-described widespread practices, so well-settled as to constitute *de facto* policy in the Chicago Police Department during the time period at issue, were able to exist and thrive because municipal policymakers with authority over the same exhibited deliberate indifference to the problem.

72. The widespread practices described in the preceding paragraphs were allowed to take place because the City declined to implement sufficient training and/or any legitimate mechanism for oversight or punishment. Indeed, the Department's system for investigating and disciplining police officers

accused of the type of misconduct that befell Plaintiff was, and is, for all practical purposes, nonexistent.

73.   Chicago police officers who manufactured criminal cases against individuals such as Plaintiff had every reason to know that they not only enjoyed *de facto* immunity from criminal prosecution and/or Departmental discipline, but that they also stood to be rewarded for closing cases no matter what the costs. In this way, this system proximately caused abuses, such as the misconduct at issue in this case.

**Count II**
**False Imprisonment**

74.   Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

75.   As described more fully above, all of the Defendants, while acting individually, jointly, and in conspiracy, as well as under color of law and within the scope of their employment, caused Plaintiff to be falsely imprisoned in violation of his constitutional rights.

76.   As a result of this violation, Plaintiff suffered injuries, including but not limited to emotional distress, as is more fully alleged above.

77.   The misconduct described in this Count was objectively unreasonable and was undertaken intentionally with willful indifference to Plaintiff's constitutional rights.

78.   The misconduct described in this Count was undertaken pursuant to the policy and practice of the Chicago Police Department in the manner described more fully above.

## Count III
## Coerced Confession -- Fourteenth Amendment

79.   Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

80.   As more fully described above, one or more of the Defendants used unjustified violence against Plaintiff in an attempt to coerce him to confess to a crime he did not commit.

81.   As a result of Defendants' unjustified use of force, Plaintiff suffered great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other consequential damages.

82.   The misconduct described in this Count was undertaken with malice, willfulness, and reckless indifference to the rights of others such that the Defendants' actions shock the conscience.

83.   The misconduct described in this Count was also undertaken pursuant to the policy and practice of the Chicago Police Department in the manner described more fully above.

## Count IV
## Coerced Confession -- Fifth Amendment

84.   Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

85. As more fully described above, one or more of the Defendants used unjustified violence against Plaintiff in an attempt to coerce him to confess to a crime he did not commit.

86. Plaintiff, who was not provided any <u>Miranda</u> warnings, was denied access to legal counsel for the duration of his interrogation, notwithstanding requests for the same. As a result of this and the other misconduct described in this Complaint, Plaintiff was forced to incriminate himself falsely against his will.

87. Plaintiff's coerced false statements were used against Plaintiff in a criminal case to his detriment.

88. As a result of Defendants' misconduct, Plaintiff suffered great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other consequential damages, as well as loss of liberty.

89. The misconduct described in this Count was undertaken with malice, willfulness, and reckless indifference to the rights of others.

90. The misconduct described in this Count was also undertaken pursuant to the policy and practice of the Chicago Police Department in the manner described more fully above.

## Count V
### Equal Protection

91.   Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

92.   As described more fully above, Defendants, all while acting individually, jointly, and in conspiracy, as well as under color of law and within the scope of their employment, denied Plaintiff equal protection of the law in violation of his constitutional rights.

93.   Specifically, these Defendants actively participated in, or personally caused, misconduct in terms of abusing minority criminal suspects in a manner calculated to coerce confessions and secure unjust convictions.  Said misconduct was motivated by racial animus and constituted purposeful discrimination; it also affected minorities in a grossly disproportionate manner vis-a-vis similarly-situated Caucasian individuals.

94.   As a result of this violation, Plaintiff suffered injuries, including but not limited to emotional distress, as is more fully alleged above.

95.   The misconduct described in this Count was objectively unreasonable and was undertaken intentionally with willful indifference to Plaintiff's constitutional rights.

96.  The misconduct described in this Count was undertaken pursuant to the policy and practice of the Chicago Police Department in the manner described more fully above.

### Count VI
### Section 1985 Conspiracy to Deprive Constitutional Rights

97.  Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

98.  As described more fully above, each of the Defendants conspired, directly or indirectly, for the purpose of depriving Plaintiff of Equal Protection of the law.

99.  In so doing, Defendants took actions in furtherance of this conspiracy, causing injury to Plaintiff.

100. The misconduct described in this Count was undertaken with malice, willfulness, and reckless indifference to the rights of others.

101. The misconduct described in this Count was undertaken pursuant to the policy and practice of the Chicago Police Department in the manner described more fully in preceding paragraphs.

### Count VII
### Section 1983 Conspiracy to Deprive Constitutional Rights

102. Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

103. After the Sanchez murders, the Defendants reached an agreement amongst themselves to frame Plaintiff for the crime, and to thereby deprive Plaintiff of his constitutional rights, all as described in the various Paragraphs of this Complaint.

104. Independently, before and after Plaintiff's convictions, each of the Defendants further conspired, and continue to conspire, to deprive Plaintiff of exculpatory materials to which he was lawfully entitled and which would have led to his more timely exoneration of the false charges as described in the various Paragraphs of this Complaint.

105. In this manner, the Defendant Officers, acting in concert with other unknown co-conspirators, including persons who are not members of the Chicago Police Department, have conspired by concerted action to accomplish an unlawful purpose by an unlawful means.

106. In furtherance of the conspiracy, each of the co-conspirators committed overt acts and was an otherwise willful participant in joint activity.

107. As a direct and proximate result of the illicit prior agreement referenced above, Plaintiff's rights were violated, and he suffered financial damages, as well as severe emotional distress and anguish, as is more fully alleged above.

108. The misconduct described in this Count was undertaken with malice, willfulness, and reckless indifference to the rights of others.

109. The misconduct described in this Count was undertaken pursuant to the policy and practice of the Chicago Police Department in the manner described more fully in preceding paragraphs, and was tacitly ratified by policy-makers for the City of Chicago with final policymaking authority.

### Count VIII
### Denial of Access to Courts

110. Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

111. In the manner described more fully herein, each of the Defendants, all while acting individually, jointly, and in conspiracy, denied Plaintiff the right to access to courts by their wrongful suppression and destruction of information and evidence which deprived Plaintiff of constitutional claims against potential Defendants.

112. Other claims were diminished by the passage of years, and the accompanying erosion of evidence necessary to prove these claims against those Defendants.

113. The misconduct described in this Count was undertaken with malice, willfulness, and reckless indifference to the rights of others.

24

114. The misconduct described in this Count was undertaken pursuant to the policy and practice of the Chicago Police Department in the manner described more fully in preceding paragraphs.

## Count IX
### Failure to Intervene

115. Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

116. In the manner described above, during the Constitutional violations described above, one or more of the Defendants (and other as-yet-unknown Chicago Police Officers) stood by without intervening to prevent the misconduct.

117. As a result of the Defendant Officers' failure to intervene to prevent the violation of Plaintiff's constitutional rights, Plaintiff suffered pain and injury, as well as emotional distress.  These Defendants had a reasonable opportunity to prevent this harm, but failed to do so.

118. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally with willful indifference to Plaintiff's constitutional rights.

119. The misconduct described in this Count was undertaken pursuant to Chicago's policy and practice in the manner described in preceding paragraphs.

**Count X**
**Malicious Prosecution**

120. Each of the paragraphs of the Complaint is incorporated as if restated fully herein.

121. Defendant Officers caused Plaintiff to be improperly subjected to judicial proceedings for which there was no probable cause.  These judicial proceedings were instituted and continued maliciously, resulting in injury, and all such proceedings were terminated in Plaintiff's favor in a manner indicative of innocence.

122. Defendant Officers accused Plaintiff of criminal activity knowing those accusations to be without probable cause, and they made statements to prosecutors with the intent of exerting influence to institute and continue the judicial proceedings.

123. Defendant Officers' statements regarding Plaintiff's alleged culpability were made with knowledge that said statements were false and/or perjured.  In so doing, Defendant Officers fabricated evidence and withheld exculpatory information.

124. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice and reckless indifference to Plaintiff's rights.

125. As a result of this violation of his rights, undertaken pursuant to the City's policy and practice as described above, Plaintiff suffered injuries, including but not limited to emotional distress.

## Count XI
### IIED

126. Each of the paragraphs of this complaint is incorporated as if fully restated herein.

127. In the manner described more fully above, the Defendant Officers engaged in extreme and outrageous conduct.

128. Defendant Officers either intended that their conduct would cause severe emotional distress to Plaintiff or knew that there was a high probability that their conduct would cause severe emotional distress to Plaintiff.

129. The misconduct described in this Count was undertaken with malice, willfulness, and reckless indifference to the rights of others.

130. As a proximate result of this misconduct, undertaken pursuant to the City's policy and practice as described above, Plaintiff suffered injuries, including but not limited to severe emotional distress.

## Count XII
### Respondeat Superior

131. Each Paragraph of this Complaint is incorporated herein.

132. In committing the acts alleged in the preceding paragraphs, the Defendant Officers were members and agents of the Chicago Police Department acting at all relevant times within the scope of their employment.

133. Defendant City of Chicago is liable as principal for all torts committed by its agents.

## Count XIII
## Indemnification

134. Each Paragraph of this Complaint is incorporated herein.

135. Illinois law provides that public entities are directed to pay any tort judgment for compensatory damages for

which employees are liable within the scope of their employment activities.

136. The Defendant Officers are or were employees of the Chicago Police Department who acted within the scope of their employment in committing the misconduct described above.

WHEREFORE, Plaintiff, ERIC CAINE, respectfully requests that this Court enter judgment in his favor and against Defendants, CITY OF CHICAGO, JON BURGE, JAMES PIENTA, RAYMOND MADIGAN, WILLIAM MARLEY, WILLIAM PEDERSON, DANIEL MCWEENY, and UNIDENTIFIED EMPLOYEES of the CITY OF CHICAGO, awarding

compensatory damages, costs, and attorneys' fees, as well as any other relief this Court deems just and appropriate.

### JURY DEMAND

Plaintiff, ERIC CAINE, hereby demands a trial by jury pursuant to Federal Rule of Civil Procedure 38(b) on all issues so triable.

RESPECTFULLY SUBMITTED:


s/ Russell Ainsworth
Attorneys for Eric Caine

Arthur Loevy
Jon Loevy
Michael Kanovitz
Russell Ainsworth
Pier Petersen
LOEVY & LOEVY
312 North May Street
Suite 100
Chicago, IL 60607
(312) 243-5900

## CERTIFICATE OF SERVICE

I, Russell Ainsworth, an attorney, certify that on December 20, 2011 I served by electronic means copies of the complaint, civil cover sheet, and attorney appearances, on the counsel of record.

s/ Russell Ainsworth